IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Deltric Darnell Smith, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 21 C 2188 |
| v. ) | |
| ) | Hon. Nancy L. Maldonado |
| ) | |
| Tom Dart, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Deltric Darnell Smith, a prior detainee at the Cook County Jail who was originally proceeding pro se, brought this civil rights action under 42 U.S.C. § 1983, alleging that another inmate threw feces on him, and that correctional officers delayed his clean up. Upon screening, Judge Rowland allowed Smith to proceed on his complaint on a claim of unconstitutional conditions of confinement against Defendants Sergeant Lawrence Majoch and Officer Lytton Despenza (collectively, the "Defendants"). (Dkt. 8.) Defendants have now moved for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies and that his claim fails on the merits. (Dkt. 65.) For the reasons set forth below, Defendants' motion for summary judgment is granted. Civil case terminated.

### Factual Background[1]

Plaintiff Deltric Darnell Smith was, at all times relevant to this case, incarcerated at the Cook County Department of Corrections ("CCDOC"). (Dkt. 66, DSOF ¶ 1.)[2] He was housed in

---

[1] The Court draws the facts from the following filings, referred to hereafter as follows: Defendants' LR 56.1(a)(2) statement of facts (Dkt 66, "DSOF"); Smith's LR 56.1(b)(2) response to Defendants' statement of facts (Dkt. 84-2, "DSOF-PR"); and Defendants' LR 56.1(c)(2) response to Plaintiff's additional facts (Dkt. 86, "PSOF-DR"). If a fact is in dispute, the Court so notes.

[2] In citations to the docket, page numbers are taken from the CM/ECF header, except when the Court cites to deposition testimony, in which case the Court will cite to the internal transcript page and line number.

Division 11, Tier BF during the underlying events. (*Id.* ¶ 9.) At all relevant times, Defendant Sergeant Lawrence Majoch and Defendant Officer Lytton Despenza were employees of CCDOC's Sheriff Office. (*Id.* ¶¶ 2–3.)

Upon entering a CCDOC living unit, inmates are issued bedding, linens, clothing, and certain personal hygiene items. (Dkt. 84-2, DSOF-PR ¶¶ 6-9.) Clothing is exchanged twice a week at a minimum and each exchange is logged. (*Id.* ¶ 7.) CCDOC Officers can give inmates new laundry outside the regular course, but laundry is not located on the tiers; it must be accessed elsewhere. (*Id.* ¶ 10.)

## I. March 7, 2021 Incident

The initial series of events underlying this lawsuit are mostly not in dispute. On March 7, 2021, at approximately 10:04 a.m., Smith was in his cell when another detainee, Kishawn Brownlee, approached the cell and initiated a verbal altercation with Smith through the cell. (Dkt. 86, PSOF-DR ¶¶ 3-5.) Brownlee then threw a brown liquid substance from a bottle through the chuck hole of Smith's cell door. (*Id.*; Dkt. 84-2, DSOF-PR ¶ 21.) The substance was what inmates at CCDOC refer to as a "feces bomb," a bottle containing a mix of feces and urine. (Dkt. 86, PSOF-DR ¶ 7.) Smith alleges the substance landed on his uniform and on other surfaces in his cell as well. (*Id* ¶ 9; Dkt. 84-2, DSOF-PR ¶ 21.) The substance did not land anywhere on his body aside from his uniform. (Dkt. 84-2, DSOF-PR ¶ 21.) Smith had a functioning sink in his cell, but he did not use it to wash up at that time because he says it was covered in the feces. (*Id.* ¶¶ 26, 31; Dkt. 86, PSOF-DR ¶ 25.)

At approximately 11:15 a.m., Defendant Officer Despenza arrived on Smith's tier to conduct a tier security check and day room tier change, as scheduled. (Dkt. 84-2, DSOF-PR ¶ 22.) During the security check, at approximately 11:19 a.m., Despenza released Smith from his cell into

the tier's dayroom. (*Id.* ¶ 23.) At this time, Smith informed Despenza that Brownlee had assaulted him with the feces bomb. (*Id.*) Defendants assert that Smith could have washed up while he was in the dayroom, but in response, Smith states that he could have only done so if he broke away from Despenza and washed himself in the sink in the dayroom. (*Id.* ¶ 26.)

CCDOC has a policy and procedure for their staff members who discover blood or potentially infectious material spills, which includes protocols to limit the number of persons exposed and to ensure that a trained sanitation staff member is contacted to clean up the contaminated area. (*Id.* ¶¶ 24, 12.) At approximately 11:22 a.m., Despenza finished her security check and then, following the CCDOC policy and procedures, immediately notified Defendant Sergeant Majoch via the phone of Smith's incident. (*Id.* ¶ 24.) Majoch promptly reviewed the cameras on Tier BF and radioed in an order for a response team to report to the tier. (*Id.* ¶ 25.)

At approximately 11:40 a.m., Despenza escorted Smith to Division 11 holding to await a new housing assignment; Smith had taken off his shirt as it was covered in feces and he was therefore no longer wearing a shirt at this time. (*Id.* ¶ 27; Dkt. 86, PSOF-DR ¶ 31.) Majoch ordered Despenza to escort Smith to the dispensary to be examined and treated by medical staff. (Dkt. 86, PSOF-DR ¶ 18.) Majoch further averred in an affidavit that he directed Despenza to escort Smith to Division 11 holding if medical personnel cleared him, so that he could obtain a new housing assignment. (Dkt. 66-13, Ex. M at ¶ 9.)

At the dispensary, Nurse Jacqueline Jack (who is not a defendant in this case), examined and treated Smith. (Dkt. 84-2, DSOF-PR ¶ 29.) During his examination, Smith told Nurse Jack that the feces and urine, "did not get on his body" (but rather landed on his uniform). (*Id.*) Nurse Jack had no treatment to offer Smith, and Smith alleges she recommended getting him a clean uniform and a shower. (*Id.* ¶ 28; Dkt. 86, PSOF-DR ¶ 19.)

3

At approximately 11:52 a.m., Officer Despenza brought Smith back to a cell in the Division 11 holding area. (Dkt. 84-2, DSOF-PR ¶ 30; Dkt. 86, PSOF-DR ¶ 20.) Smith remained in this holding cell until approximately 5:00 p.m. that evening when he was transferred to a new tier, Tier AF, in Division 11. (Dkt. 86, PSOF-DR ¶¶ 4, 20.) Much of what occurred in the interim while Smith was in holding awaiting a cell transfer is in dispute.

Defendants presented evidence that Smith was issued a new set of clothing while he was in the holding cell, although they do not specify when in the 5-hour timeframe this occurred. (*Id.* ¶¶ 21–22) (citing Dkt. 66-12, Ex. L; 66-13, Ex. M ¶ 10; Dkt. 66-15, Ex. O ¶ 9.) Smith, however, testified that he was not issued a new set of clothing until the following day, March 8, 2021, at noon. (*Id.* ¶ 22.)

Smith testified that he asked all the officers in Division 11 holding for a change of clothes and the opportunity to wash up, and he says that some of them responded that they are "not in control of the situation" and "whoever is in control of the situation, they gonna come see about you." (*Id.* ¶ 34; Dkt. 66-1 at 66:4–11.) Defendants do not appear to dispute that Smith asked the holding officers for a change of clothes and opportunity to wash up. (Dkt. 86, PSOF-DR ¶ 34.) Smith also testified that he asked Majoch for a change of clothes and the opportunity to wash up "earlier that day" when Majoch told Smith to go down to holding, but in his affidavit, Majoch averred that he did not personally interact with Smith on March 7. (*Id.*; Dkt. 66-1, Ex. A at 46:21–24, 66:16–24; Dkt. 66-1, Ex. M ¶ 8.) Smith testified that he does not recall if he asked Despenza earlier that day if he could wash up. (Dkt. 84-2, DSOF-PR ¶ 32.)

Smith further asserts that his first opportunity to wash up or take a shower was on March 8 at about noon. (Dkt. 86, PSOF-DR ¶ 23.) Defendants dispute this assertion and claim that Smith had the opportunity to wash-up immediately after the incident while he was in his original cell on

4

Tier BF and then when he was in the dayroom awaiting transfer to Division 11 holding. (*Id.*; Dkt. 84-2, DSOF-PR ¶ 26.)

## II. Smith's March 12, 2021 Grievance

Smith filed a grievance regarding the March 7, 2021 incident. (Dkt. 66-3, Ex. C at 13.) CCDOC has a formal grievance process, which requires inmates to submit an Inmate Grievance Form within fifteen days of the relevant incident and to appeal the grievance response within fifteen days of receipt of the grievance response. (Dkt. 84-2 ¶ 14.) A plaintiff must file an appeal to exhaust his administrative remedies. (*Id.*) The grievance form states the criteria for a proper grievance. (*Id.* ¶ 15; *see, e.g.*, Dkt. 66-3 at 13.)

Inmates file their grievances by handing them to a Correctional Rehabilitation Worker ("CRW") or supervisor when they make their rounds. (Dkt. 84-2 ¶ 16.) The CRWs collect grievance forms and log grievances into the grievance database on a daily basis. (*Id.* ¶ 19.) Upon receipt of the grievance form, the jail official signs and dates the form and provides the individual in custody with a copy of the grievance. (*Id.* ¶ 18.) It is the responsibility of the individual in custody to retain a copy of any submitted grievance for his records. (*Id.*) Each grievance has an individual and unique tracking number automatically issued by the Inmate Grievance Database. (*Id.* ¶ 19.)

On March 12, 2021, Smith submitted a grievance ("the March 12 Grievance") regarding the March 7, 2021 incident in which Brownlee threw the feces bomb. (Dkt. 84-2, DSOF-PR ¶ 39.) The March 12 Grievance was given control number 2021X039034. (*Id.*) Smith identified the time and place of the incident, but he left the section for "NAME and/or INDENTIFIERS OF ACCUSED" blank. (*Id.* ¶ 40.) Smith stated, verbatim, as follows in the March 12 Grievance:

> On 3/7/2021 at about 10:00 AM I was sleeping in bed when a inmate come an wake me up asking me why I didn't go home when I replied back he threw feces on me

5

> hitting me on the face an on my body in all over my room. I had to wait a whole hour till the c/o come in an I gave her a notice of what happen. She then [illegible word] a white shirt than took me to holding about 11:15 am. I stayed in holding till 6:00 pm with feces all over me. No one has come to talk to me I want to press charges against the inmate that assaulted me with the feces

(Dkt. 66-3, Ex. C at 13.)

Smith received a response to his grievance on April 14, 2021 and then appealed the grievance on April 15, 2021. (Dkt. 84-2, DSOF-PR ¶ 39; Dkt. 66-3, Ex. C. at 15–16.) The April 14, 2021 response states that an incident investigation was generated, an emergency grievance was answered, and that Smith refused to answer questions because he has a lawsuit that he will not be talked out of. (Dkt. 66-3, Ex. C at 16.) His appeal states that the response is a "total lie I never once told anyone that I have a lawsuit[.]" (*Id.*) Smith also signed his pro se complaint to initiate a lawsuit in federal court on April 14, 2021. (Dkt. 66-1, Ex. A at 63:21–23; Dkt. 9 at 6.)

The next document, chronologically, in Smith's grievance file is one that Defendants do not discuss or acknowledge in their summary judgment submission. It is a document entitled "Emergency Grievance Action Review Form" that is dated March 16, 2021 and has the same control number—2021X039034—as the March 12 Grievance. (Dkt. 66-3, Ex. C. at 17.) Under "Grievance Summary", a Cook County Jail lieutenant wrote verbatim:

> Inmate Smith, Deltric grievance # 2021X03934 regarding an incident that occurred on living unit BF March 2021 in division 11. Inmate Smith states the following:
> - Staff failed to take care of him in a timely manner
> - Waited in holding for excessive time with feces all over him
> - Wishes to press charges

(*Id.*) Then, in a section titled, "Inquiry, Findings & Action Taken", the lieutenant wrote that he observed footage on the camera system of an inmate throwing a substance through the chuck hole of Smith's cell. (*Id.*) He further states that Smith was given two opportunities to wash up (once in his cell and once in the dayroom). (*Id.*) He continues that Smith was taken to holding where he is

6

seen "changing (issued fresh linen and clothing)." (*Id.*) He next states that Smith waited in holding until a bed was available, noting that there were "multiple incidents this day." (*Id.*) And lastly, he states that CIID will be notified that Smith wishes to press charges and the tier officer "will be dealt with administratively." (*Id.*)

On April 23, 2021, Smith's appeal was rejected; the accompanying note says, "Original Response to [illegible word]." (*Id.* at 16; Dkt. 84-2, DSOF-PR ¶ 39.)

Smith initiated the present action by filing a pro se complaint in federal court; the Court received his complaint on April 22, 2021. (Dkts 1, 9.) Judge Rowland screened Smith's complaint and allowed him to proceed on a single conditions of confinement claim based upon his allegation that he was transferred to holding covered in feces and that he remained there for five hours. (Dkt. 8.) After Defendants moved for summary judgment, on May 15, 2023, Smith retained counsel, and Smith's counsel drafted his response. (Dkt. 71.)

**Legal Standard**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of proving the absence of such a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

**Discussion**

In support of summary judgment, Defendants argue that Smith failed to exhaust his administrative remedies and, in any case, that he failed to provide sufficient evidence for his § 1983 claim. (*See generally* Dkt. 67.) The Court will address these arguments in turn, beginning with Defendants' exhaustion argument.

I. **Exhaustion of administrative remedies**

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust his administrative remedies before initiating a federal civil rights lawsuit. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement is mandatory so "a court may not excuse a failure to exhaust." *Ross v. Blake*, 578 U.S. 632, 639 (2016). If a correctional facility has an internal administrative grievance system through which an inmate can seek to correct a problem, the inmate must utilize that system before initiating litigation in federal court. *See id.* "Failure to exhaust administrative remedies is an affirmative defense; the burden of proof is on the defendants." *Williams v. Rajoli*, 44 F.4th 1041, 1045 (7th Cir. 2022) (citing *Ramirez v. Young*, 906 F.3d 530, 533 (7th Cir. 2018)).

Defendants first argue that Smith failed to exhaust his administrative remedies because his March 12 Grievance does not provide sufficient notice of the alleged conduct underlying Smith's federal complaint: the wait and delay in being able to clean himself. (Dkt. 67 at 8–10.)

The Seventh Circuit has explained that an inmate is required to give enough information in his grievance to provide correctional officials "a fair opportunity to address his complaint." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011). Generally, this means that, to satisfy the

exhaustion requirement, an inmate's complaint must track the allegations in his underlying grievance. *See Bowers v. Dart*, 1 F.4th 513, 517–18 (7th Cir. 2021) (holding that detainee failed to exhaust given the "disconnect between the grievance" targeting the failure to respond to requests for help before another detainee assaulted him and the complaint alleging that guards ignored him during the attack); *see also Ortiz v. Jefferson*, No. 1:20-CV-1033, 2023 WL 2711565, at *4 (N.D. Ill. Mar. 30, 2023) (concluding that detainee failed to exhaust when his grievance complained that certain inmates were inappropriately using communal phones and his complaint alleged that a specific detainee threatened him and he told the defendants, who ignored him). The grievance and complaint, however, need not match with surgical precision: a detainee's grievance must "specifically alert the CCDOC to the nature of the wrong . . . for which he now seeks redress" and the complaint must seek relief based on what the individuals who were the subject of the grievance "did (or what they failed to do)." *Ortiz*, 2023 WL 2711565, at *4.

The Court finds that the March 12 Grievance adequately alerted Defendants to the nature of the wrong for which Smith seeks relief. Defendants characterize the March 12 Grievance as an "inmate-on-inmate" grievance, stressing that Smith sought to press charges against the inmate that assaulted him. (Dkt. 67 at 9.) But Defendants' characterization of the March 12 Grievance is incomplete. Smith also stated in his grievance that, "[The officer] took me to holding about 11:15 am. I stayed in holding till 6:00 pm with feces all over me[.]" (Dkt. 66-3 at 13.) This statement mirrors the allegations in Smith's Complaint that the Court previously found to be key to Smith's claim of unconstitutional conditions against Defendants. (Dkt. 8 at 3) ("[T]he allegation that they transferred Plaintiff to a holding area while he was allegedly still covered in feces, and he remained there for five hours warrants further inquiry."). While the Complaint went into greater detail on the matter of delay than the grievance, the implication of Smith's grievance regarding his time in

9

the holding cell and the allegations in his Complaint are substantially similar. *See, e.g.*, *Trepania v. Nelson*, No. 20-CV-854-JDP, 2022 WL 179332, at *4 (W.D. Wis. Jan. 20, 2022) (detainee's grievance complaining that he had been given "no explanation" for why he had been held in "inhumane conditions" and was unable to wash his hands or use the toilet sufficiently correlated to his federal complaint alleging that "he could not wash his hands and that he had to use a hole in the floor for a toilet").

The congruity between Smith's grievance and Complaint is further reflected in the CCDOC's own response to Smith's March 12 Grievance. The official who addressed whether Smith's grievance was an emergency characterized Plaintiff's claim as not only a desire to press charges against the inmate, but also as a complaint that, "[s]taff failed to take care of him in a timely manner" and that he "[w]aited in holding for excessive time with feces all over him." (Dkt. 66-3, Ex. C at 17.) This evidence strongly indicates that the March 12 Grievance served its function of providing CCDOC "a fair opportunity to address [Smith's] complaint." *Maddox,* 655 F.3d at 722. Defendants cannot simply ignore Smith's statements included in his grievance about the delay he suffered in the holding cell—and the CCDOC's documented response thereto—at summary judgment. Smith's concurrent desire to press charges against Brownlee does not negate his other complaint that he was left in the holding cell covered in feces. He raised, and the CCDOC addressed, both issues.

Defendants next argue that Smith did not exhaust his administrative remedies because he did not name any of the Defendants in the grievances. (Dkt. 67 at 10.)

The Court also finds this argument unpersuasive. The CCDOC's grievance form directed Smith to specify the name or provide identifiers of the accused and he left that section blank. (Dkt. 66-3, Ex. C at 13.) But the CCDOC never rejected Plaintiff's March 12 grievance on this basis;

10

rather, CCDOC officials addressed it on the merits at every step. The Seventh Circuit has held that "[w]here prison officials address an inmate's grievance on the merits without rejecting it on procedural grounds, the grievance has served its function of alerting the state and inviting corrective action, and defendants cannot rely on the failure to exhaust defense." *Maddox,* 655 F.3d at 722 (rejecting failure to exhaust argument based on prisoner's failure to name defendants in grievance where prison had addressed grievance on the merits).

Furthermore, the PLRA does not categorically require an inmate to name prospective defendants in his grievance, even if the prospective defendants were known to him when the grievance was written. *See, e.g.*, *Donald v. Varga*, No. 17-cv-50368, 2019 WL 2525856, at *5 (N.D. Ill. June 19, 2019); *Kyles v. Beaugard*, No. 15-cv-8895, 2017 WL 4122708 (N.D. Ill. Sept. 18, 2017) (collecting cases for the proposition that a grievance does not fail to exhaust remedies if it is factually clear but does not explicitly name each defendant). The Seventh Circuit has never endorsed the "invitation to engraft onto § 1997e(a) the requirement that defendants to a civil suit be first named in an inmate's prison grievance." *Dye v. Kingston*, 130 F. App'x 52, 55 (7th Cir. 2005) (unpublished). Instead, the "failure to include named defendants in a grievance is 'a mere technical defect' where the inmate sufficiently describes the alleged wrongdoing to allow prison officials a fair opportunity to respond." *Donald*, 2019 WL 2525856, at *5 (citing *Kyles*, 2017 WL 4122708, at *8) (quoting *Maddox*, 655 F.3d at 722)). Put another way, Smith need not have named each Defendant in his grievance so long as his grievance sufficiently "raise[d] the issue which is the subject of the lawsuit." *Id*. (citing *Maddox*, 655 F.3d at 722). Here, as already explained above, Smith's grievance plainly referred to his hours-long wait in the holding cell while he was covered in feces, and thus put CCDOC officials on notice that the grieved-of issue included that delay.

The Court lastly turns to Defendants' argument that Smith filed his Complaint prematurely and thus failed to exhaust his administrative remedies. (Dkt. 67 at 8.) Specifically, Defendants point out that his Complaint is dated April 14, 2021, and he appealed the grievance one day later on April 15, 2021. (Dkt. 67 at 8.)

Seventh Circuit caselaw indicates that when a plaintiff files suit before exhausting his remedies, that failure cannot be cured by filing an amended complaint after completing the exhaustion process. *See Chambers v. Sood*, 956 F.3d 979, 984 (7th Cir. 2020) ("By its plain terms, the PLRA requires prisoners to exhaust administrative remedies *before* filing suit; a 'sue first, exhaust later' approach is not acceptable."). The Court observes, however, that the Supreme Court recently suggested, without deciding, that a plaintiff may satisfy exhaustion requirements by filing a complaint, completing the administrative process, and then filing an amended complaint. *See Ramirez v. Collier*, 595 U.S. 411, 423 (2022).

In any event, Defendants have not met their burden to demonstrate that Smith's Complaint was premature. Under the federal prisoner mailbox rule, a prisoner's pleading is treated as filed when the prisoner places it in the prison mail system. *Taylor v. Brown*, 787 F.3d 851, 858–59 (7th Cir. 2015). Although Smith signed his complaint on April 14, the date that he mailed the complaint is unknown (the federal court received his Complaint on April 22). Defendants stated in their Statement of Facts that Plaintiff sent his complaint out for filing "the same day" he signed it, (Dkt. 66, DSOF ¶ 49), but the cited deposition testimony says no such thing: Smith testified that he signed the complaint on April 14, 2021, and he was never asked when he mailed it. (Dkt. 66-1, Ex. A at 63:1–23.) It was Defendants' burden to show that Smith failed to exhaust; they failed to carry

12

it. *See Williams*, 44 F.4th at 1045. The Court will therefore not grant summary judgment on Smith's conditions of confinement claim for failure to exhaust administrative remedies.

## II. Section 1983 Liability

The Court now turns to the merits of Smith's § 1983 claim for unconstitutional conditions of confinement. The Fourteenth Amendment governs claims by pretrial detainees suing over issues related to their health and safety during confinement. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022); *Gonzalez v. McHenry County, Illinois*, 40 F.4th 824, 827 (7th Cir. 2022). Such claims are subject to an "objective unreasonableness" inquiry. *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019) (claim involving allegedly inhumane pretrial conditions of confinement). To establish a constitutional violation for conditions of confinement, a pretrial detainee must show:

> (1) the conditions in question are or were objectively serious . . . (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, 'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'

*T.S. v. Twentieth Century Fox Television*, 334 F.R.D. 518, 529 (N.D. Ill. 2020) (citing *Hardeman*, 933 F.3d at 823 (Sykes, J., concurring)).

Defendants move for summary judgment on the following grounds: (1) Smith's complaint of remaining in the soiled pants for five hours in the holding cell is not an objectively serious unconstitutional condition of confinement; (2) Smith has not produced evidence demonstrating that Defendants knowingly acted unreasonably; and (3) Smith did not suffer physical injuries, and he is thus not entitled to recover damages. (Dkt. 67 at 10–15.)

### A. Compensatory Damages

The Court first disposes of Defendants' argument regarding Smith's injuries. Defendants contend that because Smith did not suffer a physical injury as a result of the March 7, 2021

13

incident, he is not entitled to compensatory damages. (Dkt. 67 at 15.) The PLRA bars recovery of compensatory damages in actions filed by prisoners alleging only mental or emotional injury, suffered in custody, without a prior showing of physical injury. *See* 42 U.S.C. § 1997e(e); *Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003) ("[A]bsent a showing of physical injury, § 1997e(e) would bar a prisoner's recovery of compensatory damages for mental and emotional injury."). But "[a] violation of the Eighth Amendment right to be free from cruel and unusual punishment, standing alone, is a cognizable injury subject to an award of nominal or punitive damages." *Calhoun,* 319 F.3d at 941; *Pace v. Myers*, No. 16-cv-542, 2016 WL 6071797, at *5 (S.D. Ill. Oct. 17, 2016) (applying *Calhoun*'s nominal damages rule to a deliberate indifference claim brought by a pretrial detainee); *McGowan v. Shearing*, 2015 WL 8150216, at *8 (S.D. Ill. Dec. 8, 2015) (denying motion for summary judgment despite defendant's contention that the plaintiff suffered no harm because he could receive nominal damages). Accordingly, Defendants' argument that summary judgment is warranted as Smith has not suffered a physical injury is unavailing.

### B. Substantive Claim

Next, the Court evaluates whether Smith's unconstitutional conditions of confinement claim should survive summary judgment. Smith's claim focuses on Defendants' conduct following his visit to the dispensary; he faults them for transferring him to holding when he had not yet showered nor changed clothes. (Dkt. 84 at 1–2.) Under Smith's account of the facts, he ended up waiting in the holding cell for five hours in soiled pants before being transferred to a new cell, and he did not have access to a shower until noon the following day.

The Court rejects Defendants' first argument that Smith's condition was not sufficiently serious to support his constitutional claim. There are too many factual disputes to hold, as a matter of law, that Smith's conditions were not sufficiently serious. Nevertheless, the Court concludes

that summary judgment on Smith's constitutional claim is warranted as Smith has not created a genuine dispute of material fact as to whether Defendants acted unreasonably and with sufficient culpability.

To prevail on a conditions of confinement claim, a pretrial detainee must establish that the defendant "acted with the requisite culpable state of mind." *Holton v. Tharp*, No. 20-CV-1136-RJD, 2024 WL 688609, *2 (S.D. Ill. Feb. 20, 2024). A plaintiff must therefore demonstrate that the defendant was "purposefully, knowingly, or perhaps even recklessly"—but not merely negligent—"when they considered the consequences of their handling of [the plaintiff's] case." *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *see also Self v. Bergh*, 835 F. App'x 873, 875 (7th Cir. 2020). Further, courts must assess whether the defendant's conduct was objectively unreasonable, in light of the "totality of facts and circumstances" and "without regard to any subjective belief held by the [defendant]." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018)).

Here, Smith has failed to provide evidence showing that Defendants purposefully, knowingly, or recklessly acted objectively unreasonably in creating the allegedly unconstitutional result: being left in the holding cell for hours without clean clothes or a shower. Put differently, Smith has not produced evidence that Defendants knowingly delayed or thwarted his clean up in an objectively unreasonable manner. *See Miranda*, 900 F.3d at 353–54; *see also Redman v. Downs*, 854 F. App'x 736, 738 (7th Cir. 2021) (citing *Hardeman*, 933 F.3d at 823). Smith does not dispute that after Despenza learned of the incident, she contacted Majoch who then ordered a response team to report to Division 11. Smith also does not dispute Majoch's testimony that he instructed Despenza to escort Smith to the medical dispensary to be examined and to escort him to holding if medical cleared him so that he could obtain his new housing assignment. The evidence in the

15

record thus suggests that Defendants were proactive in addressing Smith's concerns. Indeed, Smith testified that he does not recall asking Despenza to wash up before she placed him in the cell. The fact that the officers in holding ultimately did not follow through on ameliorating Smith's condition does not itself mean that the named Defendants acted with the requisite culpable state of mind or objectively unreasonably when they transferred him to holding.

In his opposition brief, Smith contends that "Defendants Despenza and Majoch knew Plaintiff would likely spend several hours in the holding cell before his problems were properly addressed." (Dkt. 84 at. 2.) Smith's conjecture that Defendants "knew" Smith would experience a delay is undeveloped and unsupported by any evidence in the record. Smith, for example, did not produce evidence regarding the typical wait times in holding for a new cell assignment to suggest that Defendants acted at least recklessly by not first giving him the opportunity to clean up. Further, the lieutenant who prepared the Emergency Grievance Action Review form in Smith's grievance file documented that Smith, "waited in holding until a bed was available", and specifically noted that there were "multiple incidents this day." (Dkt. 66-1, Ex. C at 17.) The Court finds that this note suggests that Smith's wait time in the holding cell was atypical and therefore that Defendants did not purposefully or knowingly act unreasonably by bringing Smith to the holding cell without ensuring that he had new clothes or a shower first. Sheer speculation that Defendants "knew" Smith would end up waiting hours for such amenities cannot defeat summary judgment. *See generally Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) ("[A] party must present more than mere speculation or conjecture to defeat summary judgment motion."); s*ee also Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) ("As we have said many times, summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'") (citations omitted).

16

The parties' dispute over whether Smith interacted with Majoch on March 7, 2021 also does not change the Court's conclusion. Smith and Majoch have provided conflicting testimony as to whether they personally interacted that day. At bottom, however, the dispute is immaterial to whether Majoch acted purposefully, knowingly, or recklessly with respect to the consequences Smith unfortunately suffered here. During his deposition, Smith was asked, "Did you ever see Sergeant Majoch on March 7th of 2021?" to which Smith responded, "Yeah, I seen him when he walked past me and told me to go down to holding." (Dkt. 66-1, Ex. A at 46:21–24.) Smith was later asked, "Did you ask Sergeant Majoch specifically if you can wash up?" to which Smith responded, "Earlier that day, yes I asked him." (*Id.* at 66:16–19.) Even if a jury were to believe Smith over Majoch, Smith's testimony establishes only that Majoch was made aware of the incident before Smith went into holding. But the record already establishes this assertion: the parties do not dispute that Despenza reported the feces bomb incident to Majoch, and Smith does not dispute Majoch's testimony that he instructed Despenza to take Smith to holding. The evidence in the record therefore shows that Majoch acted to address Smith's situation, up to the point where Smith was brought to holding. After then, there is no evidence in the record to indicate that Majoch knew that the correctional officers in holding would fail to address Smith's concerns, that he was aware at the time that the correctional officers in holding were not providing Smith with proper care, or that any word got to him while Smith was in holding that he lacked care. *See Brown v. Walker,* No. 17-CV-588-JDP, 2019 WL 3802866, at *6 (W.D. Wis. Aug. 13, 2019) ("Walker had a right to rely on the actions of other officers and assume that her orders were carried out properly.").

Put simply, the record shows that per Majoch's orders, Despenza escorted Smith to the holding area to facilitate a new cell assignment, where he would then presumably have access to

17

new garments and the facilities to clean himself. At that point, Smith had already gone to the dispensary where a nurse cleared him. Based on the record evidence, no reasonable jury could find that Defendants purposefully, knowingly, or recklessly acted unreasonably by failing to address Smith's concerns immediately. Although the Court declines to comment on whether Smith's conditions rise to the level of a constitutional claim, the Court acknowledges that having to sit in a cell, covered in human feces, is dehumanizing. Without minimizing the physical and emotional toll that this incident had on Smith, the Court finds, that summary judgment is warranted as Smith has not created a genuine dispute of material fact regarding key elements of a conditions of confinement claim—whether these particular Defendants acted unreasonably and with the necessary culpable state of mind.

In closing, the Court also holds, relatedly, that Smith has not provided sufficient evidence for a reasonable factfinder to conclude that Defendants were personally responsible for his constitutional deprivation for the purposes of § 1983. To hold a defendant liable under § 1983, a plaintiff must show that the defendant was personally responsible for the alleged deprivation of the plaintiff's constitutional rights. *Wilson v. Warren County*, 830 F.3d 464, 469 (7th Cir. 2016). "A defendant is personally responsible 'if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.'" *Id.* For the reasons stated above, Smith did not make this showing with respect to either Defendant. The Court, in its screening order of this case, already noted that the extent of Defendants' alleged involvement was murky. (Dkt. 8 at 3.) The parties have since then developed the record, and it reflects that it was the holding cell officers—not Defendants—who denied Smith's repeated requests for a change of clothes in the holding cell. The record thus raises doubts as to whether Defendants are even the proper defendants for this case. Defendants' motion for summary judgment is therefore granted.

**Conclusion**

For the foregoing reasons, Defendants' summary judgment motion is granted. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Civil case terminated.

Date: July 10, 2024

_____
Nancy L. Maldonado
United States District Court Judge